UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

   JORDAN ("JD") HUDGENS,

                  Plaintiff,                        COMPLAINT

      - against -

   BLOOMBERG LP,                      PLAINTIFF DEMANDS A
                                    TRIAL BY JURY

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

     Plaintiff JD Hudgens, by his attorneys, Vladeck, Raskin & Clark P.C., complains of Defendant Bloomberg LP ("Bloomberg," "Defendant ," or "the Company") as follows:

<u>NATURE OF CLAIMS</u>

     1.     Hudgens worked for Bloomberg for nearly a decade, including, for approximately seven and a half years, as a full-time employee.

     2.     As evidenced by Hudgens's long tenure with the Company, his performance at Bloomberg was excellent. Prior to 2021, Hudgens was on an upward trajectory and had been consistently recognized for his outstanding contributions.

     3.     Hudgens's son has a serious and rare liver condition that has required multiple hospitalizations and two attempted transplants. Between 2021 and 2025, Hudgens has taken four leaves of absence from the Company. Two of those leaves were family leaves to care for his son. The other leaves were to attend to Hudgens's own mental health.

     4.     Each time Hudgens took leave, he faced severe backlash from the Company. Among other things, Bloomberg stripped Hudgens of important job responsibilities following his leaves; provided him with unjustified critical performance feedback; stalled his compensation;

1

made it more difficult for him to work remotely (an arrangement the Company had previously agreed to well before his first leave in 2021); and attempted to force him to leave his job despite his long tenure and stellar track record. And ultimately, while Hudgens was still on a medical leave in late 2025, Bloomberg fired him.

5.      Hudgens complained on multiple occasions about the Company's mistreatment during his tenure as a Bloomberg employee, to no avail.  Among other things, Hudgens made an internal complaint to the Company's Human Resources ("HR") Department on March 21, 2025 and submitted a complaint through counsel on April 23, 2025. When the Company continued to discriminate and retaliate against Hudgens, on June 5, 2025,  he filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging, inter alia, associational discrimination on the basis of his son's disability. Thereafter, Hudgens took a medical leave beginning on September 1, 2025 and requested accommodations for his health that would apply following his planned return to work on December 8, 2025.

6.       On or about December 4, 2025—while Hudgens was on medical leave and within weeks of his request for an accommodation—Bloomberg fired him.  His last day as a Bloomberg employee was December 8—the day he was expected to return from leave.

7.      Hudgens brings this action to remedy discrimination and retaliation in violation of the federal and local disabilities law, the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. (the "ADA"); the New York State Human Rights Law, Executive Law § 290 et seq. (the "State Law"); and the Administrative Code of the City of New York § 8-107 et seq. (the "City Law").

8.      In addition, Hudgens brings this action to remedy violations of the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA") and the New York Lawful Absences

2

Law, New York Labor Law § 215 (the "Labor Law").

9.      Hudgens seeks injunctive and declaratory relief, compensatory, liquidated and punitive damages, and all other appropriate equitable and legal relief pursuant to the ADA, the FMLA,  the Labor Law, the State Law, and the City Law.

<u>JURISDICTION AND VENUE</u>

10.      Jurisdiction of this Court is proper under 28 U.S.C. § 1331 and 42 U.S.C.A. § 12117 because Plaintiff has brought claims pursuant to the ADA, and under 29 U.S. Code § 2617 because Plaintiff has brought claims pursuant to the FMLA.

11.      This Court has supplemental jurisdiction over Plaintiff's State and City Law claims and Labor Law claims pursuant to 28 U.S.C. § 1367 because these claims closely relate to his ADA and FMLA claims, having arisen out of a common nucleus of operative facts, such that all claims form part of the same case or controversy.

12.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Bloomberg's headquarters are located in New York City and because a substantial part of the events or omissions giving rise to the claims occurred in New York City.

13.      Pursuant to Section 8-502(c) of the New York City Human Rights Law, Hudgens will cause to be served a copy of this Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

14.      On June 5, 2025, Hudgens filed a charge against Bloomberg alleging unlawful disability discrimination and retaliation with the United States Equal Opportunity

3

Employment Commission (the "EEOC"). On December 11, 2025, the EEOC issued Plaintiff a

notice informing him of the right to sue under the ADA.[1]

## FACTUAL ALLEGATIONS
### Hudgens's Experience and Performance at Bloomberg

15.    Hudgens is an engineer with approximately 25 years of experience in

information technology and software.

16.    Hudgens worked for Bloomberg for nearly a decade. Bloomberg first hired

him as a consultant in or around 2013. The Company employed him in that capacity for

approximately 14 months.

17.    In recognition of his excellent performance as a consultant, in or around

2017 Bloomberg brought Hudgens back on as a full-time employee.

18.    Hudgens's most recent title was Senior Software Engineer. For most of the

period leading up to his unlawful firing, he worked on the Visual Analytics ("VA") Workflows

Integrations team and reported to team lead Anna Shchurova ("Shchurova").

19.    Throughout his time at Bloomberg, Hudgens's job has involved a host of

responsibilities, including at various times working to resolve production tickets, contributing

code, and (prior to Bloomberg's retaliatory demotion of him, as described in more detail below),

effectively leading an approximately 16-person engineering team.

20.    Hudgens's performance was consistently strong. Prior to his family and

medical leaves, he received excellent annual performance reviews. For example, Bloomberg

praised him as a "key developer" on his team; lauded his "proficiency" and "enthusiasm" at his

---

[1] On January 30, 2026, he filed a second EEOC charge against Bloomberg alleging unlawful disability discrimination and retaliation in connection with his unlawful firing. After he receives a right-to-sue notice based on the second charge, he will seek to amend his claims to add additional claims under the ADA related to his firing.

4

work; and praised his leadership skills, including his successful mentorship of others on his team.

21.     Hudgens also received regular informal praise from his colleagues, managers, and Bloomberg leadership. Among many examples, in or around 2021, Michael Bloomberg, Bloomberg's founder and then-CEO, reached out to Hudgens directly concerning a question he had about Bloomberg's technology. When Hudgens promptly responded to his question, Michael Bloomberg praised Hudgens for his knowledge and contributions.

22.     Also in or around 2018 or 2019 (prior to Hudgens's family and medical leaves), Hudgens had, on his own initiative, become the primary employee responsible for leading the Company's hackathons. Hackathons are collaborative events at which employees work to generate new solutions to technological problems. During his time leading this process, Hudgens managed approximately 10 hackathons, a process that involved, for each event, bringing together approximately 50 employees over a series of months to bring the hackathon to fruition. The hackathons were wildly successful, and Bloomberg still employs much of the technology that was developed through the hackathons.

23.     Prior to disclosing his son's disability and taking protected leaves to care for himself and his family, Hudgens was never notified of any serious deficiency in his performance or otherwise warned that his position was in jeopardy.

<u>Hudgens's Son's Medical Condition and Hudgens's Leaves of Absence</u>

24.     Hudgens's son has a serious and rare liver condition that has required him to be hospitalized on multiple occasions, including on two occasions where he received liver transplants.

25.     Hudgens requested and received his first leave related to his son's medical condition in or around late 2021 to care for his son during his first attempted liver transplant.

Hudgens was on leave continuously between December 2021 and February 2022 while caring for his son.

26.    Hudgens again requested and received leave from May 2023 through June 2023 to again care for his son during his second liver transplant.

27.    Hudgens's third leave from the Company took place between September 2024 and December 2024 to care for himself during a mental health crisis. At the time, Hudgens was engaged in a custody battle with ex-wife and, as a part of that process, was attending intensive mental health treatment for himself and with his children at the direction of the court.

28.    Hudgens's took a fourth and final leave of absence between September 1, 2024 and December 8, 2024 to care for his own mental health at the direction of his medical providers. Around that time, Hudgen's son experienced a significant downturn in his health and was hospitalized. Those circumstances exacerbated Hudgens's existing mental health condition and required that he take a leave from work.

<u>Retaliation for Hudgens's Initial Protected Leaves</u>

29.    Each time Hudgens took leave, the Company's retaliation was swift and harsh.

A.    <u>Removal of Job Responsibilities</u>

30.    Between 2021 and September 2025, Bloomberg continually removed Hudgens's core job responsibilities following his protected leaves. This pattern escalated following each successive leave and resulted in Hudgens working in a diminished role with little opportunity for growth.

31.    For example, from December 2020 through early 2022 (when Hudgens returned from his first leave), Hudgens was responsible for planning, owning, and directing

multiple initiatives (known as "EPICs") critical to Bloomberg's New Generation Platform (NGP) re-architecture. As a part of that process, Hudgens was the point person for charting processes and effectively acted as chief architect for those initiatives. As part of this role, Hudgens had significant leadership responsibilities, including that he had hiring and management responsibilities on his team.

32.    When Hudgens returned from leave, he learned that his responsibilities as chief architect had been reassigned to Austin Lasher ("Lasher"), an employee who had far less experience than Hudgens, whose hiring Hudgens had been involved in, and who Hudgens trained. Although Lasher left the Company approximately a year after Hudgens returned from leave, Bloomberg never returned those responsibilities to Hudgens.

33.    Following Hudgens's return from his second leave, in or around 2023, his role was transitioned again from a technical leadership role to a QA-focused managerial role (effectively a Client Support Manager position). In that role, instead of leading technical initiatives, Hudgens was primarily responsible for overseeing individuals responding to client support tickets. This type of role is known in Hudgens's field to be a career "kiss of death" because there are few, if any, opportunities for growth arising from this position.

34.    Finally, following his return from his third leave in or around 2024, Hudgens was once again demoted from working effectively as a Client Support Manager to  what was effectively a more junior Engineer position, including that Bloomberg stripped from Hudgens the few remaining responsibilities where he had ownership over tasks and teams. As part of this demotion, Hudgens was no longer officially overseeing any team members, and he was removed as the primary point of contact for the charting processes he initially led and built. Hudgens's responsibilities were given away to his coworkers who had far less experience than Hudgens. For

example, many of his responsibilities were reassigned to a colleague who has little to no experience in charting.

35.    Following the demotion in or around 2024, management also disparaged Hudgens to his colleagues, including telling more junior employees not to ask him questions because, in sum and substance, he was "just an Engineer."

B.  Retaliatory Performance Reviews

36.    Hudgens also received increasingly critical reviews following his protected leaves. The criticism in his reviews is baseless and, on information and belief, was given in retaliation for his protected complaints.

37.    As detailed above, between 2018 (Hudgens's first full year working as a full time employee) and 2021 (prior to his protected leave), his reviews were excellent.

38.    Hudgens's evaluations for the next two years (following his first two protected leaves), remained positive but included some critical feedback, even though his performance during those years had remained as strong as in the years prior.

39.    In 2024 (following his third protected leave), Hudgens received, for the first time, a harshly critical review. The review stated, among other things, that Hudgens "fell short of" achieving his primary goal for the year—establishing a KTLO process—and that "[a]chieving this required greater initiative, creativity, ownership, and independent problem-solving, which [Hudgens] did not demonstrate."

40.    On information and belief, this review was pretext for the Company's discrimination and retaliation against Hudgens and the criticisms in it were disingenuous at best. Among other examples, the KTLO process to which the review referred had historically been under the control of multiple team leaders at a time and worked on by dozens of employees (if not

8

more). As of the time of the negative performance review, the process had been reassigned to Hudgens as the sole point of contact. During a six-month period in 2024, Hudgens was tasked with creating documentation and processes to enable his team leads (both of whom had virtually no relevant experience) and new team members to learn the KTLO process. As far as Hudgens is aware, no one at Bloomberg has ever successfully created this type of documentation for a process as complex as KTLO.  Even though it was a daunting task, Hudgens executed it as well as possible. He was able to dramatically improve on the KTLO process (as indicated by improvements to an objective, internal "health" score) and his work resulted in the creation of extensive process documentation being created.

41.    Bloomberg also accused Hudgens in the 2024 review of neglecting a particular ticket. This, too, was false. He had repeatedly escalated issues with the referenced ticket to Malamut and Shchurova. Although Shchurova told Hudgens that she would handle the ticket herself, she failed to do so. Shchurova's attempt to blame Hudgens for her own failure to address the ticket was, on information and belief, retaliatory and a blatant effort to cover up her own performance deficiencies.

42.    The accusation that Hudgens neglected a ticket is also undermined by his outsized productivity in resolving tickets. In 2024 alone, he successfully resolved 365 tickets personally, or 30% of the work of his approximately 10-person team.

C.  Retaliatory Compensation Decisions

43.    In addition, between 2021 (following Hudgens's initial leave) and 2025, his compensation stalled significantly and without basis.

44.    Between 2018 and 2021 (prior to his leaves), Hudgens's bonuses steadily increased between 4-7% year over year, consistent with his positive performance reviews.

45.    At the end of 2022 (the first compensation cycle after his first leave), his bonus increased by only 1%.

46.    At the end of 2023 (after his second leave), his bonus increased by less than one percent.

47.    At the end of 2024 (after his third leave), Hudgens received no bonus increase.

D.    Retaliatory Decisions Concerning Hudgens's Flexible Work Arrangement

48.    Although Hudgens is assigned to work at Bloomberg's headquarters in New York, he lives with his family in Georgia.

49.    In or around 2019, prior to his protected leaves, Hudgens requested a flexible work arrangement where he would work from New York three days a week and from Georgia two days a week.  The Company, which even prior to the pandemic had flexible policies concerning remote work and alternative work arrangements, approved his request without question.

50.    In or around January 2024, in part because of his son's illness, Hudgens requested an adjustment to his flexible work arrangement whereby he would work from Georgia three days a week rather than two days per week. Hudgens explained at the time that the remote work arrangement would not interfere with his role because, even when based in New York, Hudgens (like most others on his team) runs meetings remotely over zoom so that each individual has access to their monitors with their development work during the meetings.

51.    In contrast to the Company's flexibility responding to his 2019 request, when Hudgens requested an adjustment to his flexible work arrangement in January 2024, the Company immediately denied it without providing a reason.

#1033658

52.     Hudgens reiterated his request in April 2024 to ask that he be permitted to work from the Company's office in Georgia three days per week and remotely from home in Georgia two days per week. Hudgens explained again that he required the flexible work arrangement to care for his son who continued to require his care from time to time. Hudgens did not receive a response to this request.

53.     In addition to refusing to approve his requests for Flexible Work Arrangements following his family and medical leaves, the Company also used these requests as an opportunity to try to force Hudgens out of the Company. For instance, in response to Hudgens's requests for work in 2023 and 2024, the Company's HR Department suggested, in response to Hudgens's request for flexible work, that the Company would consider granting his request to work from Georgia for a limited period of time, but only for the purpose of allowing him to find another job outside of the Company.

<u>Hudgens's Complaints and Continued Retaliation</u>

54.     Given the onslaught of discrimination and retaliation against him, on March 21, 2025, Hudgens submitted a complaint to the Company's HR Department concerning Bloomberg's unlawful conduct. Hudgens subsequently spoke multiple times with an HR representative to provide further information about his concerns consistent with the information detailed above.

55.     On or about April 17, 2025, the HR representative contacted Hudgens to inform him that the Company was "administratively closing" his complaint. On information and belief, the Company took no action to address or alleviate his concerns.

56.     Having been unable to resolve his concerns internally, on April 23, 2025, Hudgens complained via counsel about the Company's unlawful discrimination and retaliation.

11

57.    Following his complaint with HR and through his lawyer, the Company's retaliatory treatment has only escalated.

58.    Hudgens repeatedly received unfounded critical feedback, including in the weeks following his complaint via counsel.

59.    For example, in early 2025, Hudgens led the migration of a Bloomberg analytics service known as tastatsvc. This was a legacy system that needed to be rewritten because the hardware it ran on was becoming obsolete. The initial estimate was that this work would take six months. Hudgens completed it in two.

60.    After Hudgens delivered the completed work in or around May 2025, he received critical comments from his team lead Shchurova. She sent multiple emails on or about May 19 and May 20, 2025 (copying other senior engineers) claiming that his documentation and testing were inadequate. Shchurova's criticisms were baseless. Contrary to her feedback, the documentation Hudgens provided was more extensive than that typically involved in Bloomberg services.

61.    Hudgens also had multiple meetings with Shchurova in the weeks after he complained through counsel in which Shchurova was unfairly critical of his performance and requested that Hudgens complete tasks that made no sense (and, in some cases), that he had already done. For example:

- On or about May 23, 2025, Shchurova instructed Hudgens, among other things, to produce for her a testing strategy document for a particular process, even though Hudgens had already prepared and sent to her a detailed testing strategy. Shchurova again referenced the purported absence of testing strategy;

- In a meeting on May 27, 2025 Shchurova scolded Hudgens with respect to the same process that no services would be allowed into production without "proper and complete testing plans," even though, as described above, Hudgens had already provided her such a plan;

12

- Hudgens met again with Shchurova on June 2, 2025. During that meeting, she once again raised the need for testing strategy (which Hudgens had completed) and complained about purported delays in work product, even though she was plainly aware that Hudgens had been coordinating and delivering his tasks according to schedule;

- In a meeting on June 4, 2025, Shchurova reiterated and escalated her baseless criticism. The prior evening, Hudgens sent an email to Shchurova and another colleague asking for clarification concerning an estimated time frame for an ongoing project. In contrast with the tone of that email, which was courteous, Shchurova lashed out at Hudgens the following day, accusing him without basis of being "very unprofessional." Shchurova proceeded to set new requirements for Hudgens's ongoing project which the two had never previously discussed and explicitly threatened his job, stating that if he did not have a certain task completed by Friday (June 6, 2025), they would be having a "different kind of conversation."

62.    On information and belief, Bloomberg continued to document Hudgens's purported performance issues in an effort to create a paper trail to justify taking further action against him, which they ultimately did.

<u>Hudgens's Protected Complaint to the EEOC and Additional Retaliation</u>

63.    Hudgens filed a Charge of Discrimination with the EEOC detailing Bloomberg's discrimination and retaliation against him on June 5, 2025.

64.    In the months after Hudgens filed the EEOC Charge, Shchurova only escalated her criticism of Hudgens. Shchurova has attacked Hudgens purportedly for not completing work in a timely manner (even though other employees over whom he had no control were responsible for bottlenecks); has given him shifting instructions with impossible to complete timelines; and issued him for the first time formal discipline, including threatening him with termination. Among other examples:

- On June 26, 2025 (less than three weeks after Hudgens filed this charge), Shchurova issued Hudgens a verbal warning—the only formal discipline Hudgens had ever received during his long tenure at Bloomberg. The warning, among other things, demanded that Hudgens complete tasks under an unrealistic timeframe over which he did not have control and followed inconsistent direction from Shchurova that created further confusion.

13

- On July 1, 2025, Shchurova criticized Hudgens's performance again, and warned him in sum and substance that he should do better given that he was in a "performance improvement period." This was the first time that Hudgens was ever notified that he was purportedly in a "performance improvement period"— a formal process that, under Bloomberg's policies, must be documented. Following this discussion, Hudgens never received any documentation about the purported performance improvement period.

- On August 13, 2025, Shchurova issued Hudgens a negative mid-year performance review for 2025. In the mid-year review, Shchurova 1) continued to criticize Hudgens for delays that were due to the involvement of other engineers, who Bloomberg did not manage or otherwise control; 2) lambasted the quality of his code for the first time in his nearly ten years as an engineer at Bloomberg; 3) chided Hudgens for reorganizing code, something that he had previously done repeatedly at the direction of management and without reprisal; 4) criticized Hudgens for a temporary change wherein part of a code base had been inadvertently reverted to a prior version, something that was readily detected as part of normal peer review and immediately fixed; and 5) accused Hudgens for the first time of failing to appropriately test his work, despite his long career at Bloomberg and proven results of issuing high-quality code and even though Shchurova had never provided him with contrary guidance for testing. The review concluded by stating that it should be considered a "written warning" and noting that Hudgens's employment was at risk of termination.

- On September 4, 2025, Shchurova accused Hudgens in writing of saying that he was "recording and watching her," which is false. Although Hudgens has told Shchurova that he takes contemporaneous notes of their meetings, he has never said that he was "recording" or "watching" Shchurova.

<u>Hudgens Requests Medical Leave and Accommodations</u>

65.     On or about September 1, 2025, Hudgens began a medical leave from Bloomberg at the recommendation of his medical providers. The leave was precipitated by a sharp decline in his son's condition that significantly impacted Hudgens's mental health.

66.     Hudgens's leave was set to expire on December 8, 2025.

67.     On or about October 22, 2025, Hudgens submitted paperwork to Bloomberg from his medical provider requesting that Hudgens be permitted to work from home as an accommodation between his return to work on December 8, 2025 and April 1, 2026 due to his

14

continuing mental health difficulties.

Unlawful Firing

68.    On or about December 4, 2025—while Hudgens was on medical leave and within weeks of his request for an accommodation—one of his managers, Antuan Byalik ("Byalik") informed Hudgens that Bloomberg was firing him. Byalik explained that the decision was purportedly based on Hudgens's performance. He further told Hudgens that Bloomberg wanted to be compassionate given Hudgens's "circumstances." Byalik told Hudgens that his last day would be December 8—the day Hudgens was expected to return from leave.

69.    Hudgens believes that the Company's purported justification was pretextual.

70.    First, Bloomberg fired Hudgens after he filed his protected complaint with the EEOC, while Hudgens was on medical leave for his mental health, and within weeks of his requesting an accommodation.

71.    Second, for the reasons explained above,  Bloomberg's earlier criticisms of Hudgens's performance were unfounded and retaliatory. On information and belief, Bloomberg's decision to fire Hudgens based on its prior, pretextual attacks on his performance was merely a continuation of the Company's unlawful conduct.

FIRST CAUSE OF ACTION
ADA: Discrimination Based on Plaintiff's Disability and
His Association with a Person with a Disability

72. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 71 of this Complaint as if set forth fully herein.

73.    Plaintiff has had, at all relevant times, a "disability" as that term is defined in the ADA and/or was "regarded as" having a disability within the meaning of that statute.

15

Plaintiff was able to perform the essential functions of the job with a reasonable accommodation, and therefore was at all relevant times a "qualified individual with a disability" within the meaning of the ADA.

74.    Plaintiff's son has had, at all relevant times, a disability as that term is defined in the ADA.

75.    By the acts and practices described above, Bloomberg discriminated against Hudgens on the basis of his disability and/or because it regarded him as having a disability and discriminated against him based on his association with his son, a person with a disability.

76.    Bloomberg acted intentionally and with malice and/or reckless indifference to Plaintiff's federally protected rights.

77.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of discriminatory practices by Bloomberg.

<u>SECOND CAUSE OF ACTION</u>
<u>State Law: Discrimination Based on Plaintiff's Disability and</u>
<u>His Association with a Person with a Disability</u>

78.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 77 of this Complaint as if set forth fully herein.

79.    Plaintiff has had, at all relevant times, a "disability" as that term is defined in the State Law and/or was "regarded as" having a disability within the meaning of that statute. Plaintiff's disability did not prevent him from performing his job with a reasonable accommodation.

80.    Plaintiff's son has had, at all relevant times, a disability as that term is defined in the State Law.

16

81.     By the acts and practices described above, Bloomberg discriminated against Hudgens on the basis of his disability and/or because it regarded him as having a disability and discriminated against him based on his association with his son, a person with a disability.

82.     Bloomberg acted with malice and/or reckless indifference to Plaintiff's rights protected under state law.

83.     Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of Defendant 's discriminatory practices.

THIRD CAUSE OF ACTION
City Law: Discrimination Based on Plaintiff's Disability and
His Association with a Person with a Disability

84.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 83 of this Complaint as if set forth fully herein.

85.     Plaintiff has had, at all relevant times, a "disability" as that term is defined in the City Law and/or was "regarded as" having a disability within the meaning of that statute. Plaintiff's disability did not prevent him from performing his job with a reasonable accommodation.

86.     By the acts and practices described above, Bloomberg discriminated against Hudgens on the basis of his disability and/or because it regarded him as having a disability and discriminated against him based on his association with his son, a person with a disability.

87.     Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of Defendant 's discriminatory practices.

#1033658

88.    Defendant engaged in the discriminatory conduct with conscious or reckless disregard of Plaintiff's rights.

## FOURTH CAUSE OF ACTION
### ADA: Retaliation

89.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 88 of this Complaint as if set forth fully herein.

90.    By the acts and practices described above, Bloomberg retaliated against Plaintiff for his protected complaints in violation of the ADA.

91.    Bloomberg acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

92.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of the retaliatory acts by Bloomberg.

## FIFTH CAUSE OF ACTION
### State Law: Retaliation

93.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 92 of this Complaint as if set forth fully herein.

94.    By the acts and practices described above, Defendant retaliated against Plaintiff for his protected complaints in violation of the State Law.

95.    Bloomberg acted with malice and/or reckless indifference to Plaintiff's rights protected under state law.

96.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of Defendant 's retaliatory acts.

18

#1033658

## SIXTH CAUSE OF ACTION
### City Law: Retaliation

97.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 96 of this Complaint as if set forth fully herein.

98.     By the acts and practices described above, Defendant  retaliated against Plaintiff for opposing Bloomberg's unlawful conduct, in violation of the City Law.

99.     Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of Defendant 's retaliatory acts.

100.     Defendant  engaged in the retaliatory conduct with conscious or reckless disregard of Plaintiff's rights.

## SEVENTH CAUSE OF ACTION
### FMLA: Retaliation

101.     Plaintiff repeats and realleges paragraphs 1 through 100 of this Complaint as if fully set forth herein.

102.     By the acts and practices described above, Bloomberg retaliated against Plaintiff for attempting to exercise his rights and for his opposition to Bloomberg's unlawful conduct, in violation of the FMLA, 29 U.S.C. § 2615(a)(2).

103.     Bloomberg knew that its actions violated the FMLA; these violations of the FMLA were willful and not in good faith.

104.     Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of Bloomberg's actions.

19

#1033658

NINTH CAUSE OF ACTION
Lawful Absence Law: Retaliation

105.     Plaintiff repeats and realleges paragraphs 1 to 104 of this Complaint as if fully set forth herein.

106.     By the acts and practices described above, Defendant subjected Plaintiff to unlawful retaliation in violation of the Labor Law, including, but not limited to, interfering with and punishing him for requesting leave as a reasonable accommodation and for requesting leave to care or his son.

107.     Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of Defendant 's retaliatory practices.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

a.     declaring that the acts and practices complained of herein are in violation of the ADA, the FMLA, the State Law, the Labor Law, and the City Law;

b.     enjoining and permanently restraining these violations of the ADA, the FMLA, the State Law, the Labor Law, and the City Law;

c.     directing Defendant to pay plaintiff an additional amount as liquidated damages under the FMLA and the Labor Law;

c.     directing Defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff;

d.     directing Defendant to place Plaintiff in the position he would have occupied but for Defendant 's discriminatory and retaliatory conduct and making him whole for

20

all earnings and other benefits he would have received but for Defendant 's discriminatory and retaliatory treatment, including, but not limited to, wages, bonuses, pension, and other lost benefits;

f.     directing Defendant  to pay Plaintiff compensatory damages, including damages for emotional distress, humiliation, and pain and suffering;

g.     directing Defendant  to pay Plaintiff punitive damages;

h.     awarding Plaintiff his reasonable attorneys' fees and costs;

i.     awarding Plaintiff such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award; and

j.     granting such other and further relief as the Court deems necessary and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury in this action.

Dated: New York, New York
       March 5, 2026

VLADECK, RASKIN, & CLARK, P.C.

By:     */s/ Emily Bass*
        _____
        Emily Bass
        Attorneys for Plaintiff
        111 Broadway, Suite 1505
        New York, New York 10006
        (212) 403-7300

#1033658